Robert D. RUFENACHT and Robert W. Lewis, d/b/a R & L Cattle Company, Plaintiffs,

v.

IOWA BEEF PROCESSORS, INC., Defendant.

PROCHEMCO CATTLE PARTNERS, LTD., and Prochemco, Inc., Plaintiffs,

v.

IOWA BEEF PROCESSORS, INC., Defendant.

Civ. A. Nos. CA–2–76–16, CA–2–76–33.

United States District Court, N. D. Texas, Amarillo Division.

June 20, 1980.

Donald L. Davis, James W. Witherspoon, Witherspoon, Akin & Langley, Hereford, Tex., for Prochemco.

Don L. Patterson, Culton, Morgan, Britain & White, Amarillo, Tex., Neil E. Holmen, Winston & Strawn, Chicago, Ill., for Rufenacht.

Edward W. Rothe, James Malysiak, Freeman, Rothe, Freeman & Salzman, Chicago, Ill., and Robert L. Templeton, Templeton & Garner, Amarillo, Tex., for defendant.

## MEMORANDUM OPINION

MARY LOU ROBINSON, District Judge.

In this diversity suit, R & L Cattle Company and Prochemco Cattle Partners, Ltd.,[1] seek to recover losses incurred from separate cattle transactions involving James Louie Heller and Iowa Beef Processors (IBP). In each transaction, Heller purchased cattle from a plaintiff with his personal checks, took delivery, then sold and delivered the cattle to IBP. Heller's personal checks were subsequently dishonored or not paid. Plaintiffs then turned to IBP for payment, which IBP refused. This suit followed, with plaintiffs advancing four theories of recovery against IBP: (1) agency; (2) apparent authority; (3) conversion; and (4) collateral estoppel.

## I

### FACTS

Louie Heller began dealing with IBP through its head cattle buyer, Russell Walker, in 1964 or 1965. Walker testified that Heller approached him about order buying cattle for, or in the alternative selling cattle to, IBP. Walker refused Heller's offer to order buy cattle, but did begin purchasing quantities of cattle from him.

In 1968, Heller registered with the Packers & Stockyards Administration of the U.S. Department of Agriculture and posted the requisite cash bond as security for the payment of the cattle which he bought.

---

1. Prochemco Cattle Partners, a limited partnership formed by Prochemco, Inc., to feed cattle as a tax-sheltered investment, was dissolved on July 14, 1974. Prochemco, as the general partner, absorbed all losses in excess of the limited partners' capital contributions.

Each year thereafter Heller filed annual reports of his operations with the Administration.

Also in 1968, IBP, having no salaried cattle buyer on the South Plains[2] where Heller operated, entered into a course of dealing with Heller whereby Russell Walker regularly offered to purchase cattle from him. Walker provided information concerning the maximum number of cattle of the type and weights desired by IBP, the price IBP would pay per pound for dressed beef, the date the cattle were to be delivered and the length of time the offer was to remain open. Heller usually accepted all or a portion of the offer, either at that time or at a later time before the offer lapsed.

Heller bought cattle on a live weight basis. He paid for the cattle with his personal checks. He normally dealt with the custom feed yard manager, or in some instances directly with the owner of the cattle on feed. Once an agreement was reached, Heller had ten days to take delivery or the cattle would be placed back on feed for his account.

Heller sold cattle to IBP on a dressed weight basis. Once the dressed weight was determined, IBP paid Heller by check. If requested IBP would advance Heller a portion of the estimated dressed weight of the cattle after they were in its possession. The partial payments were made by wire transfer from IBP's bank to Heller's bank.

The cattle which Heller sold to IBP were ordinarily transported by railcars leased by Heller and loaded at special sidings located in Amarillo and at the Hereford Feed Yard. Heller paid all the freight charges stemming from these shipments and bore the risk of loss resulting from the death of the cattle prior to delivery.

Heller bought cattle from areas other than the South Plains and sold to packers other than IBP. During the period from approximately 1964 to 1974, Heller bought cattle in Illinois, Iowa, Missouri, New Mexico, Oklahoma, and Texas. He sold cattle to Arizona Beef Company, Armour, Cleveland Livestock, Constantino Package Company, IBP, Randell Loveless, Missouri Beef Packers and James Yontz.

*The R & L Cattle Company Transaction*

On January 29, 1974, Louie Heller agreed to buy 720 head of cattle owned by R & L Cattle Company and on feed at United Beef Producers' feed yard near Hereford, Texas. The sale was approved by both Rufenacht and Lewis, partners in R & L Cattle Company.

Heller took delivery of the cattle on four separate days beginning on January 30, 1974, and concluding on February 8, 1974. On each occasion, United Beef Producers prepared an invoice showing Heller as the buyer and R & L Cattle Company as the owner. No reference was made to IBP.

Heller had the cattle transported by truck from the feed yard to a railroad siding, where the cattle were loaded onto railcars and shipped to IBP at Emporia. Upon receiving each of the first three shipments, IBP wired a partial payment to Heller's bank. Once IBP determined the dressed weight of the cattle in each shipment, checks for the balance of the purchase price were forwarded to Heller's account. No partial payment was transmitted on the fourth shipment of cattle, but IBP did make the full payment to Heller's trustee in bankruptcy.

It is stipulated that both United Beef Producers and R & L Cattle Company expected Heller to pay for the cattle with his personal checks. When no checks were received after Heller took delivery of the final shipment of cattle, Lewis asked the feed yard manager to investigate. After the manager met with Heller, payment for the first two shipments of cattle was received on February 9, 1974, in the form of two checks payable to United Beef Producers.

On Monday morning, February 11, 1974, at the feed yard manager's request Heller

2. The area designated as the "South Plains" refers generally to Eastern New Mexico and the Panhandle of Texas.

voided the two checks payable to United Beef Producers and reissued them in the names of the owners. Heller also issued checks for the last two deliveries of cattle. These four checks, which the manager transmitted to R & L Cattle Company, were not paid.

On February 19, 1974, certain of Heller's feed yard creditors filed an involuntary petition in bankruptcy. Heller consented to adjudication and was later adjudged bankrupt (BK 2–74–9).

R & L Cattle Company thereafter filed claims against Heller's Packers & Stockyards bond and his bankrupt estate. R & L Cattle Company recovered $20,434.90 and $99,358.12 from the respective claims.

R & L Cattle Company seeks to recover from IBP the balance of approximately $240,000 owing on the cattle sold to Heller.

*The Prochemco Cattle Partners' Transaction*

Shortly before Sunday, January 27, 1974, Louie Heller purchased 137 head of cattle owned by Prochemco Cattle Partners. These cattle were on feed at Prochemco's Hereford Feed Yard, which was managed by Richard Crider. In negotiating this transaction with Crider, Heller did not represent that he was acting on behalf of IBP.

Heller took delivery of the cattle on Sunday, January 27, 1974, at which time the cattle were weighed, the aggregate purchase price of $74,758.32 was determined, and a regular invoice prepared by feed yard personnel. The invoice and feed yard scale tickets were the only documents issued in connection with the sale and delivery of the cattle. The invoice showed Prochemco Cattle Partners as the seller and Louie Heller as the buyer. The only mention of IBP was in the "Remarks" section of the invoice, which contained a notation that the cattle had been "shipped to IBP at Emporia, Kan., via the railroad." This was known because the cattle were loaded directly on Heller's railcars at the Hereford Feed Yard's siding.

Heller combined the 137 head of cattle from Prochemco Cattle Partners with 104 head of cattle from two other owners at different feed yards. He then shipped the cattle in two railcars to IBP at Emporia. They arrived and were killed on Monday, January 28, 1974.

Upon receiving the cattle, IBP wired a $55,000 partial payment for each carload of cattle to Heller's bank at Peoria, Illinois. On the following day, IBP mailed two checks to Heller's bank for the balance due, computed on the dressed weight of the cattle. The checks were for $10,271.65 and $9,777.73. IBP's checks were deposited in Heller's account on January 31, 1974.

The invoice directed Heller to mail his check for the cattle to Prochemco's Amarillo office. When Heller's check did not arrive by Friday, February 8, 1974, one of Prochemco's clerks called the feed yard to have Crider follow up on the matter. Heller's check was subsequently received by Prochemco and deposited on February 19, 1974. It was returned unpaid on February 28, 1974.

In April, Prochemco Cattle Partners filed a claim against Heller's Packers & Stockyards bond and also filed a proof of claim in the bankruptcy proceedings. Prochemco Cattle Partners thereafter recovered $4,245.09 and $16,948.80 on the respective claims.

This suit was instituted to recover from IBP the balance of approximately $53,000 owing on the cattle which plaintiff sold to Heller.

## II

## AGENCY

Plaintiffs allege that Heller acted as the agent of IBP in purchasing the cattle in question. Plaintiffs specifically contend that Heller was an order buyer for IBP, i. e., a person buying cattle on the specific order of a packing firm and being compensated on a commission basis. IBP denies these allegations and claims Heller acted as a cattle dealer, purchasing cattle on his own account in hope he could later resell them for a profit.

■ The term "agency" denotes the legal relationship, created by express or implied agreement or by operation of law, whereby the agent is authorized to act for the principal, subject to the principal's control. *See, Tarver, Steele & Co., Inc. v. Pendleton Gin Co.*, 25 S.W.2d 156, 158 (Tex.Civ.App.—Eastland 1930, no writ); *Harkins v. Murphy & Bolanz*, 51 Tex.Civ.App. 568, 112 S.W. 136, 137 (Tex.Civ.App. 1908, writ dism'd).

Texas has adopted Section 14 K of the Restatement (Second) of Agency (1957), which provides that:

One who contracts to acquire property from a third person and convey it to another is the agent of the other only if it agreed that he is to act primarily for the benefit of the other and not for himself.

*American Employers Insurance Co. v. Kilgore*, 412 S.W.2d 67, 69 (Tex.Civ.App.—Amarillo 1967, writ ref'd n.r.e.); *Valley View Cattle Company v. Iowa Beef Processors, Inc.*, 548 F.2d 1219, 1221 (5th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977). The Comment to Section 14 K states:

* * * Factors indicating that the one who is to acquire the property and transfer it to the other is selling to, and not acting as agent for, the other are: (1) that he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property.

Comment, Restatement (Second) of Agency § 14 K (1957).

■ The evidence shows that IBP paid Heller an agreed price per dressed carcass weight pound, irrespective of the live weight price which Heller paid for the cattle. Thus, Heller relied on his knowledge of the cattle industry to determine the price he would pay for the live cattle, for he personally bore the risk of loss in the event the dressed price which IBP paid him was insufficient to cover the live weight purchase price.

In each of the transactions Heller acted in his own name and was issued invoices listing him as the buyer of the cattle. Plaintiffs also provided Heller with copies of the scale tickets involved in each transaction, which, together with the invoices, were the only indicia of title in this case.

Further, the evidence establishes that Heller operated an independent business which engaged in the buying and selling of cattle for a profit. This evidence, considered with that already reviewed by the Court and in context with the factors enumerated in the Comment to Section 14 K of the Restatement, indicates that Heller acted as a seller in his transactions with IBP rather than as an agent.

In addition, the evidence is generally inconsistent with the various witnesses' accounts of what constitutes an order buyer. According to these witnesses, an order buyer is restricted to a designated area by the packing firm, does not assume the risk of loss on a transaction, does not generally receive advances from the packing firm, and does not pay the freight charges stemming from transporting the cattle to the packer. Heller was not restricted to buying cattle from a designated area, but bought cattle in a number of states other than Texas and New Mexico. In each of the transactions in question, Heller bore the risk of loss, received advances from IBP, and paid the freight charges on the shipments to IBP.

The Court concludes that Heller was not the agent of IBP, but rather was an independent cattle buyer engaging in the business of buying and selling cattle for a profit at his own risk.

III

APPARENT AUTHORITY

Plaintiffs next contend that IBP vested Heller with the appearance of authority so as to make IBP liable for Heller's purchases of the cattle in question. IBP denies these allegations.

■ The doctrine of apparent authority is based on estoppel. An alleged principal, who engages in conduct which would lead a reasonably prudent person, using diligence and discretion, to suppose that the alleged agent has the authority he purports to exercise, is estoppel from denying such authority. *Rourke v. Garza*, 530 S.W.2d 794, 802 (Tex.1975), *quoting, Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422 (1953). Only the conduct of the alleged principal may charge him under this doctrine. *Southwest Title Insurance Company v. Northland Building Corporation*, 552 S.W.2d 425, 428 (Tex.1977). The doctrine will not apply unless the person dealing with the alleged agent is misled and acts to his prejudice by reason of the alleged principal's conduct. *Cox Dry Goods Co. v. Kellog*, 145 S.W.2d 675, 680 (Tex.Civ.App.—Waco 1940, writ ref'd); *First Texas Joint Stock Land Bank v. Holloway*, 77 S.W.2d 301, 302 (Tex. Civ.App.—Amarillo 1934, no writ).

■ IBP had no direct dealings with the feed yards on the South Plains concerning Louie Heller. It was generally known among feed yard personnel, however, that IBP did not have a regular salaried cattle buyer on the South Plains. It was also known that Heller regularly communicated with IBP, that he purchased large quantities of cattle, and that many of these cattle were shipped to IBP. These facts alone are inconclusive on the question of apparent authority.

Further, the evidence does not show that IBP acquiesced in conduct by Heller which would charge IBP with liability by virtue of apparent authority. Heller did not represent to either Prochemco Cattle Partners or R & L Cattle Company that he was the agent of IBP. Heller acted in his own name and paid for the cattle with his personal checks. Both Prochemco Cattle Partners and R & L Cattle Company prepared invoices on the sales in question which named Heller as the buyer. R & L Cattle Company stipulated that it expected Heller to pay for the cattle with his personal checks, as he had done in the past. Richard Crider, manager of the Hereford Feed Yard where the Prochemco Cattle Partners' cattle were sold, testified that:

Q. When you sold cattle to Louie Heller, who did you expect to pay for these cattle?

A. Well, the checks came from Louie Heller.

Q. Was he the person you expected to pay for them?

A. Right.

It is clear that Crider expected Heller to pay for the 137 head of cattle which were purchased from Prochemco Cattle Partners. Finally, Prochemco Cattle Partners and R & L Cattle Company each filed claims and had recoveries against Heller's Packers & Stockyards bond and his bankrupt estate.

The Court concludes that IBP is not liable to plaintiffs under the doctrine of apparent authority for the balance owing on the cattle purchased by Heller.

## IV

## CONVERSION

■ Plaintiffs allege that IBP wrongfully converted the cattle in question by purchasing them with the knowledge that Heller did not have good title. IBP denies the allegation and maintains that it is a good faith purchaser for value.

Section 2.403 of the Texas Business and Commerce Code provides, in part, that:

(a) * * * A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though

\* \* \* \* \* \*

(2) the delivery was in exchange for a check which is later dishonored.

Tex. Bus. & Comm. Code Ann. § 2.403(a)(2) (1968).

In the transactions in question, Heller bought cattle from plaintiffs with his personal checks. Heller took delivery of the cattle, was issued an invoice by plaintiff, and was given a copy of the scale tickets. The invoices and scale tickets constituted the only indicia of title issued in this suit.

Heller sold and delivered the cattle to IBP. IBP paid Heller for the cattle. IBP purchased the cattle without knowledge that Heller had acquired possession of the cattle by giving worthless checks as payment. IBP acted without knowledge of any irregularity in the method or means by which Heller acquired possession of the livestock. IBP did not know that Prochemco Cattle Partners or R & L Cattle Company had an interest in the cattle.

The Court concludes that IBP was a good faith purchaser for value of the cattle and that it is not liable under the law of conversion.

## V

### COLLATERAL ESTOPPEL

Plaintiffs seek to offensively assert the doctrine of collateral estoppel against IBP. Plaintiffs contend that IBP is barred from relitigating the theories of agency, apparent authority and conversion because those theories have been determined adversely to IBP in *Valley View Cattle Company v. Iowa Beef Processors, Inc.*, 548 F.2d 1219 (5th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977), and in *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, CA 5–76–6 (N.D.Tex.1978), *appeal docketed*, No. 78–2271 (5th Cir. June 14, 1978).

The doctrine of collateral estoppel bars the relitigation in a subsequent lawsuit of fact issues actually litigated and essential to a prior judgment. *Benson v. Wanda Petroleum Company*, 468 S.W.2d 361, 362 (Tex.1971). Texas courts have traditionally applied this doctrine when: (1) the issues in the subsequent action are identical to the issues previously adjudicated and essential to a prior judgment; (2) the prior judgment is final; and (3) the parties in the subsequent action are the same or in privity with the parties to the prior action. *See, Swilley v. McCain*, 374 S.W.2d 871 (Tex.1964); *Kirby Lumber Corp. v. Southern Lumber Co.*, 145 Tex. 151, 196 S.W.2d 387, 388–89 (1946). Texas courts have recently indicated, however, that the doctrine may be applied where the traditional requirement of identity of parties is not satisfied. *See, Benson v. Wanda Petroleum Company, supra; Olivarez v. Broadway Hardware, Inc.*, 564 S.W.2d 195 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); *Hardy v. Fleming*, 553 S.W.2d 790 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). *See also, Seguros Tepeyac, S.A., Compania Mexicana de Seguros Generales v. Jernigan*, 410 F.2d 718 (5th Cir. 1969).

The United States Supreme Court, in *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), held that a party who has had issues of fact adjudicated adversely to it in an equitable action may be collaterally estopped from relitigating the same issues in a subsequent legal action brought against it by a new party. In so holding, the Court concluded that:

> * * * the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Shore, supra*, at 331, 99 S.Ct. at 651–52.

*The prior Valley View judgment*

In *Valley View*, Louie Heller bought 259 head of cattle from Valley View Cattle Company. Heller sold and delivered the cattle to IBP at its Emporia plant. Valley View later received payment from Heller in the form of his personal check, which was dishonored upon presentment.

Valley View sued IBP to recover the value of the cattle sold to Heller alleging three theories against IBP, to-wit: (1) Heller acted as the agent of IBP in purchasing the cattle; (2) IBP vested Heller with apparent authority; and (3) IBP converted the cattle

to its own use. The trial court submitted the theories to the jury on special interrogatories, which were all answered in favor of Valley View. Judgment was entered accordingly.

The *Valley View* court submitted the question of actual agency as follows:

Do you find from a preponderance of the evidence that James Louie Heller was acting as the agent for Iowa Beef Processors *at the time of his purchase of the cattle in question* from Valley View Cattle Company? (emphasis added)

The jury affirmatively answered this question. The Fifth Circuit Court of Appeals affirmed.

An examination of the Fifth Circuit opinion in *Valley View* reveals that the basis of affirmance was not the existence of an express agreement of agency between IBP and Heller, but rather the presence of evidence from which a jury could imply an agency relationship. The court thus concluded that "there was sufficient evidence in support of the jury's finding that Heller purchased the cattle in question as the agent of IBP." *Valley View Cattle Company v. Iowa Beef Processors, Inc., supra*, at 1221.

Both the jury's answer to the special interrogatory on actual agency and the Fifth Circuit affirmance of that answer are limited to the transaction between Valley View Cattle Company and Louie Heller. Whether an agency relationship could also be implied in the case at bar has not been resolved by the *Valley View* finding. The Court concludes that the actual agency issue resolved in *Valley View* is not identical to the issue presented in this case.

The Court further finds that the issues submitted by the *Valley View* court on the theory of apparent authority are not identical to the issues presented in this case. An essential element of this theory of recovery is that plaintiff rely upon the apparent authority of the alleged agent to his prejudice. *See, Southwest Title Insurance Company v. Northland Building Corporation*, 552 S.W.2d 425, 428 (Tex.1977). Neither Prochemco Cattle Partners nor R & L Cattle Company

was a party, or in privity with a party, in the *Valley View* case. Thus, the jury finding that the conduct of Heller and IBP led Valley View to reasonably believe Heller was the agent of IBP is necessarily limited to that decision.

■ The *Valley View* court also submitted to the jury several issues referable to the theory of conversion. On appeal, the Fifth Circuit did not address these issues. The court simply stated: "The evidence was sufficient to take the case to the jury on actual and implied authority, the jury has decided that, and there it must end. We need not discuss the other issues." Where an appellate court affirms on one ground without passing on the other, the second ground is no longer conclusively established under the collateral estoppel doctrine. *See,* 1B Moore's Federal Practice ¶ 0.416[2] at 2232.

■ The Court is also of the opinion that the application of the doctrine of collateral estoppel to the present case would be unfair to the defendant. The *Valley View* record is not before the Court. Yet it is apparent from the Fifth Circuit opinion that the agency relationship found to exist in *Valley View* was implied from the circumstances surrounding that particular transaction. To apply the doctrine in the present suit would deprive defendant of the right to present evidence concerning the transactions now in question which would not have been admissible in the *Valley View* litigation.

The Court concludes that IBP is not barred by the prior *Valley View* judgment from litigating the theories of agency, apparent authority and conversion in the present suit.

*The prior Lubbock Feed Lots judgment*

In the *Lubbock Feed Lots* litigation, as in *Valley View* and in the present suit, Louie Heller purchased cattle with worthless checks. When payment could not be made by Heller, Lubbock Feed Lots sued IBP to recover the value of the cattle. Lubbock Feed Lots advanced the three theories which had been raised in *Valley View*, but

the jury found for plaintiffs only on the issues of actual and apparent authority.

The Court, applying the same analysis used in the discussion of the *Valley View* judgment, finds that the actual agency issue decided in *Lubbock Feed Lots* is not identical to the agency issue presented in the case at bar. The Court further finds that it would be unfair to defendant to apply the doctrine of collateral estoppel with regard to the actual agency issue. Finally, the apparent agency findings in *Lubbock Feed Lots* are necessarily limited to that decision.

The Court concludes that IBP is not barred by the *Lubbock Feed Lots* judgment from litigating the issues of agency and apparent authority in the present suit.

## VI

## CONCLUSION

Louie Heller did not act as the agent of IBP in purchasing the cattle in question. Heller was an independent cattle buyer who acted in his name, was invoiced in his name and personally accepted the risk of loss on each purchase of cattle and subsequent re-sell.

IBP did not vest Heller with the appearance of authority. Prochemco Cattle Partners and R & L Cattle Company each expected Heller to pay for the cattle which he purchased. When Heller's checks were dishonored, both plaintiffs filed claims and recovered against Heller's Packers & Stockyards bond and against his bankrupt estate. Only when these recoveries proved insufficient to satisfy Heller's entire obligation did plaintiffs institute suit against IBP.

IBP purchased the cattle in question from Heller as a good faith purchaser for value. Therefore, IBP is not liable under the law of conversion.

Finally, IBP is not collaterally estopped from litigating the theories of agency, apparent authority and conversion which have been presented by this suit.

Accordingly, the Court will enter judgment that plaintiffs take nothing from their actions against IBP.